UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CINDY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 09-40211-FDS |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
AND PLAINTIFF'S MOTION TO REVERSE**

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration denying the application of plaintiff Cindy Brown for social security disability insurance ("SSDI") benefits. Brown appeals the denial of her application for SSDI pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g). Brown contends that she became disabled on August 18, 2006. She submitted medical records indicating that she suffers from depression, serum negative rheumatoid arthritis, migraine headaches, and fibromyalgia. She now disputes the Commissioner's holding that she is not "disabled" within the meaning of the Social Security Act.

Pending before the Court are Brown's appeal and the Commissioner's motion to affirm. For the reasons stated below, the motion to affirm will be denied, and the motion to reverse will be granted.

**I.     Background**

Cindy Brown is a 42-year-old high school graduate. (AR at 121, 123). At the time she submitted her application, Brown's teenage daughter lived with her. (*Id.* at 22-23). Brown has previously worked as an exterminator, a receptionist, a school-bus driver, and a customer-service agent. (*Id.* at 40). She has not worked since August 18, 2006, the alleged onset date of her disability. (*Id.* at 26, 115).

A. **Medical Evidence**

On June 8, 2005, Brown started seeing chiropractor Paul Kowacki to treat pain related to fibromyalgia and arthritis. (*Id.* at 195-206). Brown continued to see Kowacki through April 6, 2009. (*Id.* at 347-50).

On September 19, 2005, Raymond Sauls, M.D., Brown's primary care physician, diagnosed fibromyalgia and noted a history of migraine headaches. (*Id.* at 244-45). Dr. Sauls prescribed Vicodin to help alleviate musculoskeletal pain. (*Id.* at 244). At a follow-up appointment on December 15, 2005, Dr. Sauls further diagnosed plantar fasciitis and restless leg syndrome. (*Id.* at 243). Dr. Sauls instructed her to keep taking her current medications. (AR at 243). Brown followed up with Dr. Sauls periodically thereafter. (*Id.* at 238-46). However, she did not see Dr. Sauls between August 2006 and August 2007. (*Id.* at 241-42).

As noted, Brown stopped working on August 18, 2006. (*Id.* at 26, 115).

In August 2007, Brown underwent physical therapy at Ramey Rehabilitation, Inc., for pain associated with rheumatoid arthritis and fibromyalgia. (*Id.* at 167-72). At her initial consultation, Brown stated that she felt pain everywhere, and reported a pain level of five on a scale of ten. (*Id.* at 170, 172). She underwent pool therapy and normal physical therapy. (*Id.* at 171). Following that treatment, her pain decreased to a reported level of four. (*Id.* at 170).

2

On August 27, 2007, she applied for SSDI benefits. (*Id.* at 90-94).

At an appointment with Dr. Sauls on August 30, 2007, he noted that she still had pain in her joints and struggled to put on her jewelry because of swelling in her hands. (*Id.* at 241). Ramey Rehabilitation notified Dr. Sauls on October 10, 2007, that Brown had been discharged because she failed to schedule additional appointments and failed to return calls. (*Id.* 170, 247).

On November 6, 2007, Brown saw Allan Ramey, M.D., a rheumatologist. He noted that she suffered from headaches. (*Id.* at 230).

On January 26, 2008, Brown went to Athol Memorial Hospital Emergency Room complaining of a severe migraine headache. (*Id.* at 249-54). She underwent a radiological examination, but the results were negative. (*Id.* at 254). She was treated with medication and discharged. (*Id.* at 249).

On February 7 and April 7, 2008, Dr. Sauls again noted that Brown suffered from fibromyalgia, rheumatoid arthritis, migraine headaches, and depression. (*Id.* at 238-39). Dr. Sauls provided Brown with samples of Cymbalta and Imitrex and advised her to continue all other medications. (*Id.*).

On May 7, 2008, Dr. Ramey noted that Brown suffered from fibromyalgia and arthritis. (*Id.* at 212). At a visit on June 11, he again noted that she experienced headaches. (*Id.* at 210). On August 9, 2008, in correspondence to Dr. Sauls, Dr. Ramey indicated that Brown had begun gold salts therapy to treat pain associated with multiple joints and malaise associated with her arthritis. (*Id.* at 208). He noted that she was tolerating the therapy well. (*Id.*).

Brown is currently on a variety of medications. She takes Arava, Nabumetone, Prednisone, and Plaquenil for her rheumatoid arthritis. (*Id.* at 28-29, 161). She takes Fluoxetine

3

for her depression and Amitriptyline as a sleep aid. (*Id.* at 29-30, 161). She takes Requip for restless leg syndrome. (*Id.* at 28-29, 161). For pain, she takes Vicodin and Lidoderm Lidocaine patches, and Pro Air HFA for asthma. (*Id.* at 30,162). She takes Treximet for migraine headaches. (*Id.* at 31, 162).

      B.     **<u>Residual Functional Capacity Assessment</u>**

On September 25, 2007, Malin Weeratne, M.D., calculated Brown's physical residual functional capacity ("RFC") based on her medical records. (*Id.* at 173-80). Dr. Weeratne indicated that Brown suffered from fibromyalgia and rheumatoid arthritis. (*Id.* at 173). Dr. Weeratne determined that Brown could occasionally lift 20 pounds and could frequently lift ten pounds; and that she could stand or walk with normal breaks for at least two hours out of an eight-hour workday and sit with normal breaks for a total of six hours in an eight-hour workday. (*Id.* at 174). Dr. Weeratne also indicated that because of her impairments, she could only climb, balance, stoop, kneel, crouch, and crawl occasionally. (*Id.* at 175). She noted that Brown did not have any communicative, manipulative, or visual limitations, but that she should avoid concentrated exposure to extreme cold and hazards (such as machinery and heights). (*Id.* at 176-77).

On April 22, 2009, Dr. Ramey calculated Brown's physical RFC. (*Id.* at 351-52). Dr. Ramey stated that Brown's ability to lift and carry were affected by her chronic back pain and tenderness; however, he did not indicate the maximum amount of weight Brown would be able to carry. (*Id.* at 351). Dr. Ramey stated that she could stand or walk for less than two hours without rest and two to four hours with rest. (*Id.*) While he concluded that she could sit for two hours without interruption, he did not indicate how many hours in an eight-hour workday she

4

could sit. (*Id.*). Dr. Ramey found that she could climb, balance, stoop, crouch, and kneel occasionally, but not crawl. (*Id.* at 352). Moreover, he noted that she should avoid heights, temperature extremes, humidity, and vibration. (*Id.*).

### C. Procedural Background

Brown applied for SSDI benefits on August 27, 2007, contending that she became disabled on August 18, 2006. (*Id.* at 90-94). Her application was denied by both the Commissioner on initial review and after subsequent review by a Federal Reviewing Official. (*Id.* at 45-53). She requested an administrative hearing, and the hearing was held on May 6, 2009 by an Administrative Law Judge ("ALJ"). (*Id.* at 16-44). The ALJ heard testimony both from Brown, who was represented by a non-attorney, and a vocational expert. (*Id.* at 7, 16).

The ALJ issued his decision on June 23, 2009, finding that Brown was not disabled. (*Id.* at 7-15). This decision became final on September 30, 2009 after the Decision Review Board failed to complete a timely review. (*Id.* at 1-3). Having exhausted all her administrative remedies, Brown filed this complaint on December 4, 2009. *See* 20 C.F.R. § 405.420(b)(2).

## II. Analysis

### A. Standard of Review

This Court's review of a Social Security disability benefit determination is limited. *See* 42 U.S.C. § 405(g) (2010). Questions of law are reviewed *de novo*, but findings of fact, "if supported by substantial evidence, shall be conclusive." *See id.*; *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### B. Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context of SSI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe enough to prevent plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[1]  The claimant has the burden of production and proof during steps one through four, and the Commissioner has the burden at step five to offer evidence of specific jobs in the economy that the applicant can perform.  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

>   C.   **Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4), but concluded that it was unnecessary to proceed past step four.  (AR at 11-14).

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 18, 2006, her alleged onset date.  (*Id.* at 9).  At the second step, the ALJ concluded that plaintiff had the following severe impairments:  depression, serum negative rheumatoid arthritis, migraine headaches, and fibromyalgia.  (*Id.*).  He noted that because these impairments impose more than a minimal effect on her ability to perform basic work-related tasks, they were severe.  (*Id.*).  While these impairments were severe, the ALJ found that they did not meet the requirements of a Listed Impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 10).

The ALJ then proceeded to the fourth step.  He considered plaintiff's RFC and whether

---

[1] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process."  *Seavey*, 276 F.3d at 5.

that would allow her to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ considered the entire record, the hearing testimony, and his observations of plaintiff at the hearing. (AR at 11-14). The ALJ noted that he did not find plaintiff's assertions of pain to be completely credible, because they were not substantiated by the medical evidence and there was a disconnect between her assertions and her daily activities and her demeanor during the hearing. (*Id.* at 12).

While the ALJ did note that Dr. Sauls had opined that plaintiff qualifies for disability, he also stated (correctly) that opinions concerning disability are reserved for the Commissioner. (*Id.* at 13). The ALJ noted that he considered the RFC conducted by Dr. Weeratne, but stated that he gave greater weight to Dr. Ramey's RFC assessment because his findings were more supportive of sedentary exertional work. (*Id.*).

After reviewing the evidence, the ALJ determined that plaintiff had the RFC to perform sedentary work. (*Id.*). He concluded that she can (1) stand/walk for at least four hours in an eight-hour workday; (2) sit for up to six hours in an eight-hour workday, in three-hour intervals; (3) stand for up to 30 minutes at a time; (4) climb ramps and stairs, balance, stoop, crouch, and kneel; and (5) push and pull with the upper and lower extremities. (*Id.* at 13). He also concluded that she cannot crawl or climb ladders and should avoid concentrated exposure to heights, temperature extremes, humidity, and vibration. (*Id.*).

The ALJ relied on the testimony of the vocational expert in comparing plaintiff's residual functional capacity to her past relevant work. (*Id.* at 14). Consistent with the vocational expert's opinion, the ALJ found that plaintiff retained the ability to complete her past work as a customer-service representative and a receptionist. (*Id.*). Because plaintiff retained a residual

functional capacity to perform her past relevant work, the ALJ found that she was not disabled within the meaning of the Social Security Act. (*Id.* at 14-15).

### D. <u>Plaintiff's Objections</u>

Plaintiff raises two objections before this Court. She contends that the ALJ erred (1) in failing to address her migraine headaches in determining her RFC, and (2) in finding plaintiff not credible because he required objective medical evidence for a subjective impairment. For the following reasons, the decision of the ALJ will be reversed.

#### 1. <u>Migraine Headaches</u>

Plaintiff's first contention is that the ALJ failed to consider the effects of her migraine headaches when he calculated her RFC. While the ALJ found her migraines to be severe, he failed to mention them in connection with her RFC at step four.

An ALJ's findings must be sufficiently specific to explain how a conclusion was reached. *Larlee v. Astrue*, 694 F. Supp. 2d 80, 84 (D. Mass. 2010) ("If the decision on its face does not adequately explain how a conclusion was reached, that alone is grounds for a remand." (quoting *Barbato v. Commissioner of Social Security Administration*, 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996) (internal quotations omitted))).; *see also Resendes v. Astrue*, 2011 WL 669090, at *16 (D. Mass. Feb. 17, 2011). In *Resendes*, the court found that a mere implication that a plaintiff's headaches imposed no limitations was not sufficiently clear. *See Resendes*, 2011 WL 669090, at *16.

The fact that the ALJ did not discuss plaintiff's headaches is more troublesome in light of the fact that he found them to be a severe impairment. The hearing decision allows for three different possibilities as to how the ALJ handled her migraine headaches. First, the ALJ could

9

have ignored her headaches when determining her RFC. Second—and as the Commissioner contends—the ALJ could have found that her headaches do not impose any limitations on her ability to work, and therefore did not include them. Third, the ALJ may have believed that her headaches were adequately incorporated into his RFC because he relied heavily on Dr. Ramey's RFC and Dr. Ramey was aware of plaintiff's headaches. While the second and third options would render the ALJ's RFC calculation valid, the fact that he did not include even a simple statement to that effect is problematic.[2]

The ALJ did not discuss plaintiff's headaches at all in step four of his analysis within the hearing decision, and therefore it is unclear whether the ALJ actually considered them in determining her RFC. Because, however, they were found to be a severe impairment, they should have been specifically addressed. The decision will therefore be reversed, and the matter will be remanded for further proceedings.

### 2. **Credibility Determination**

Plaintiff makes two arguments regarding the ALJ's credibility determination. First, she contends that in making his credibility determination concerning her claims of pain and symptomology, the ALJ failed to discuss the *Avery* factors. Second, she contends that the ALJ relied solely on objective medical evidence when he concluded that her assertions of pain were not credible.

---

[2] Plaintiff further contends that because her headaches were not accounted for in the RFC, the vocational expert's testimony is invalid. (Pl. Br. 18-19). The hypothetical proposed to the vocational expert may be invalid if the ALJ merely excluded her headaches entirely from his RFC calculation. However, if he believed her headaches imposed no limitations or were adequately accounted for in the RFC provided by Dr. Ramey, the vocational expert's testimony would remain valid.

It is undisputed that the limitations imposed by fibromyalgia are based on fundamentally subjective criteria, and therefore a credibility determination is necessary. However, while a person with fibromyalgia may have a case that is so severe as to render them "totally disabled from working . . . most do not and the question is whether [plaintiff] is one of the minority." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (internal citations omitted); *see also Lopes v. Barnhart*, 372 F. Supp. 2d 185, 189 n.6 (D. Mass. 2005). Thus, a diagnosis of fibromyalgia itself does not automatically mean that a claimant is disabled. *Tsarelka v. Sec'y of Health & Human Servs.*, 842 F.2d 529, 534 (1st Cir. 1988) ("The mere presence of a fibrositis condition does not entitle [one] to disability benefits.")

     **a.**  *Avery* **Factors**

When making a credibility determination, the ALJ is required to consider the following six factors: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness, and adverse side effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 23 (1st Cir. 1986); *see Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) ("[t]he ALJ thoroughly questioned the claimant regarding his daily activities, functional restrictions, medication, prior work record, and frequency and duration of the pain, . . . in conformity with the guidelines set out in Avery regarding the evaluation of subjective symptoms"). Because the credibility determination is for the ALJ to make, as long as his determination is supported by substantial evidence, this Court must accept his conclusions. *Ramirez v. Sec'y of Health & Human Servs.*, 550 F.2d 1286, 1286 (1st Cir. 1977); *Musto v.*

*Halter*, 135 F. Supp. 2d 220, 226-27 (D. Mass 2001). Here, there is substantial evidence that the ALJ considered each of the *Avery* factors.

The ALJ's decision directly lays out the *Avery* factors. (AR at 12). While a more thorough and detailed discussion of the evidence applicable to each of these factors would have been preferable, reversal on that basis is not required. Most significantly, there is substantial evidence in the record as to each of the *Avery* factors, and indeed plaintiff testified as to each factor.

First, testimony at the hearing addressed the nature, onset, duration, and frequency of plaintiff's pain. Plaintiff indicated that the longer she sits, the more pain she feels. (*Id.* at 28). Moreover, plaintiff said that she feels pain every day but the extent of that pain and what she can do varies each day. (*Id.* at 35, 126).

Second, the ALJ elicited testimony from plaintiff concerning her precipitating and aggravating factors. Plaintiff testified that she had hip pain, lower-back pain, and leg pain after sitting for extended periods of time. (*Id.* at 28). She further testified that her hands swell in the heat and the humidity, which decreases her dexterity. (*Id.* at 35).

Third, there was substantial evidence concerning the medications plaintiff took and the side effects of those medications. The ALJ specifically inquired as to what medications plaintiff took. (*Id.* at 28-31). While the ALJ did not himself inquire about side effects of those medications, plaintiff did testify during the hearing that her medications made her dizzy, occasionally made her drowsy, and caused her to retain fluid. (*Id.* at 33-34).

Fourth, there was evidence concerning treatment other than medication. Plaintiff testified that she sometimes used a cane to help her mobility and alleviate the pain in her left leg.

(*Id.* at 34). However, as the ALJ noted, plaintiff was not relying on the cane during the hearing. (*Id.* at 12). Moreover, there was medical evidence indicating that pool therapy may help plaintiff's stiff joints as well as gold salts therapy. (*Id.* at 170, 208). Plaintiff further testified that she uses showers and baths, as well as movement, to help relieve pain. (*Id.* at 34).

Fifth, plaintiff testified at the hearing as to the functional restrictions factor. She stated that she could normally sit for an hour and that she could stand for about a half an hour to an hour. (*Id.* at 34). After exerting herself, she has to take breaks by lying down for an hour or two. (*Id.* at 37). She also testified that she has difficulty climbing stairs. (*Id.* at 34, 352).

Sixth, as to the daily activities factor, plaintiff stated that she visits with friends who live a short distance away. (*Id.* at 24, 32, 37). Plaintiff also reported that she drove two to three times a week and would drive for a half an hour at most. (*Id.* at 24-25). Further, plaintiff stated that she did her own food shopping, although her daughter did bring the food into the house. (*Id.* at 25, 129). She also testified that her daughter helps her with chores, such as laundry, vacuuming, and washing the floor. (*Id.* at 37).

This evidence, viewed in tandem with the ALJ's summary of the *Avery* factors in the hearing decision, supports the conclusion that the ALJ considered each of the *Avery* factors. Reversal as to that issue is therefore not required.

### b. <u>Reasons for Finding Plaintiff Not Credible</u>

Plaintiff further contends that the ALJ did not indicate the reasons that he found her not entirely credible, other than the fact that objective medical evidence did not corroborate her subjective complaints of pain. (Pl. Br. 11). When determining a plaintiff's credibility, the ALJ "must make specific findings as to the relevant evidence considered in determining to disbelieve

13

the [claimant]." *DaRosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986).
While the ALJ can use the absence of corroborating medical evidence as a factor in his
determination, it cannot be the only factor upon which he relies. SSR 96-7p, 1996 WL 374186,
at *6 (S.S.A. July 2, 1996); *see also Makuch v. Halter*, 170 F. Supp. 2d 117, 127 (D. Mass.
2001).

Here, however, the ALJ indicated that the objective medical evidence, as well as
plaintiff's demeanor at the hearing and her daily activities, justified his finding that she was only
partially credible. This is supported by substantial evidence. While plaintiff stated that she
could only sit for an hour at a time, Dr. Ramey, upon whom the ALJ relied in calculating
plaintiff's RFC, stated that she could sit without interruption for two hours. (AR 34, 351).
Moreover, plaintiff stated that she could only sit for a half hour at a time, whereas Dr. Ramey
stated that she could stand for less than two hours at a time, but could stand for two to four hours
with breaks. (*Id.* at 34, 351). The agency-appointed physician said that plaintiff could stand for
even longer – three hours. (*Id.* at 174). Substantial medical evidence therefore indicates that
plaintiff's restrictions were self-imposed, as the ALJ indicated. (*Id.* at 12).

Evidence of plaintiff's daily activities also support the ALJ's finding that her assertions
of pain were not entirely credible. She testified that she leaves the house every couple of days to
socialize with her neighbors or to visit friends who live 15 minutes away. (*Id.* at 37). She
maintains the ability to drive and does so two or three times a week. (*Id.* at 24). Moreover, she
still does her own grocery shopping. (*Id.* at 25). In addition, she also admitted that she took care
of her dogs, handled her personal care, and did minimal housework. (*Id.* at 127-28). Although
she testified that her daughter typically helps her bring the groceries into the house, such

statements do not preclude the ALJ from relying on her daily activities to find her not credible. *See Teixeira v. Astrue*, 2010 WL 5158104, at *5 (D. Mass. Dec. 21, 2010) ("[t]hat Teixeira claims to have had assistance from her older daughters in completing the household work and that she often takes breaks does not prevent the hearing officer from using the testimony of Teixeira's daily activities as one factor in assessing credibility.").

Finally, the ALJ relied on his observations of plaintiff in determining her credibility. When assessing credibility, the ALJ is allowed to consider his own observations of a plaintiff. SSR 96-7p, 1996 WL 374186, at *5 ("In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements."). The ALJ noted that he did not see plaintiff using a cane, nor did he see her frequently wince in pain. (AR at 12). There was, therefore, substantial evidence to support the ALJ's credibility determination.

\*   \*   \*

In summary, the ALJ's treatment of the *Avery* factors, and his assessment of plaintiff's credibility, do not warrant reversal. However, his failure to address the issue of plaintiff's migraine headaches in determining her residual functional capacity does require reversal, and accordingly plaintiff's motion to reverse will be granted and defendant's motion to affirm will be denied.

## III. Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse the final decision of the Commissioner of the Social Security Administration is GRANTED, and defendant's motion to affirm the action of the Commissioner is DENIED.

**So Ordered.**

                                          /s/ F. Dennis Saylor
                                          F. Dennis Saylor IV
                                          United States District Judge

Dated: August 3, 2011